**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| FRANCESCA HEREDIA-CAINES, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:19-cv-05815-JMG |
| | : | |
| LEHIGH VALLEY HOSPITAL, INC., | : | |
| Defendant. | : | |

_____

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                    **January 18, 2022**

**I.    OVERVIEW**

Plaintiff claims she was subjected to various forms of racial discrimination and retaliation while working as a Customer Service Agent for Defendant. Plaintiff has brought this suit under Title VII and 42 U.S.C. § 1981 seeking recompense for that mistreatment. Defendant denies Plaintiff's claims and has asked this Court to enter summary judgment in its favor on each count.

Discrimination cases necessarily elicit strong feelings for all the individuals involved. For this reason, the Court emphasizes that it does not pass judgment on the truth of either party's version of the facts. Instead, when resolving a motion for summary judgment such as the one presently before this Court, the Court simply construes the evidence in the light most favorable to the non-movant, here Plaintiff, and determines only whether reasonable minds could disagree with the movant, here Defendant, about how to interpret that evidence. Accordingly, and for the reasons that follow, the Court grants Defendant's motion only in part.

## II.    FACTUAL BACKGROUND

### a.    Allegations

Plaintiff is from Puerto Rico and is Hispanic. DSUF ¶ 3; PCSMF ¶ 3. She worked for

Defendant for almost six years between 2013 and 2018. DSUF ¶¶ 4, 138; PCSMF ¶¶ 4, 138.

Plaintiff began her tenure working as a Scheduling Coordinator but transferred to the Patient

Financial Services Department in 2015 to become a Customer Service Agent. DSUF ¶¶ 4, 6;

PCSMF ¶¶ 4, 6. Plaintiff worked as a Customer Service Agent until she resigned on November

27, 2018. DSUF ¶ 140; PCSMF ¶ 140.

When Plaintiff began working in the Patient Financial Services Department, she worked

under a hierarchy of three managers. Plaintiff reported directly to a supervisor named Mr. Roth.

DSUF ¶ 12; PCSMF ¶ 12. Mr. Roth reported to a manager named Ms. Gerancher. DSUF ¶ 12;

PCSMF ¶ 12. And Ms. Gerancher reported to Mr. Hinkle, the Vice President of Patient Financial

Services. DSUF ¶ 32; PCSMF ¶ 32.

Plaintiff's complaints of discriminatory treatment, insofar as they relate to the claims that

remain in this case, began with the allegedly abrasive conduct of Mr. Roth over the course of the

two years between 2016 and 2017. Defendant alleges that Mr. Roth was generally known to be a

somewhat ill-tempered and unpleasant supervisor, but Plaintiff alleges that Mr. Roth singled out

Hispanic employees for particularly severe and offensive treatment. DSUF ¶¶ 44–45; PCSMF ¶¶

44–45.

Plaintiff alleges that Mr. Roth regularly made offensive comments about Hispanic

individuals. For example, when Plaintiff would voice her opinion that Patient Financial Services

should create a dedicated phoneline for Spanish speaking patients, Mr. Roth would allegedly

respond that non-Hispanic patients did not want to "hear that there is a Spanish line" and that

Hispanic individuals need to "learn English" or find "someone that can speak the language." DSUF ¶¶ 38–40; PCSMF ¶¶ 38–40. Plaintiff also alleges that she once heard Mr. Roth tell two of Plaintiff's Hispanic colleagues that Puerto Ricans used to have to "apply for papers to come to this country." DSUF ¶ 42; PCSMF ¶ 42. In total, Mr. Roth allegedly made comments like these on about five occasions.

Plaintiff also alleges that Mr. Roth was physically aggressive toward Plaintiff and other Hispanic employees. Plaintiff alleges that Mr. Roth yelled at her a couple of times and that Mr. Roth once raised his voice at her when she asked for help with a difficult call. DSUF ¶¶ 46–47; PCSMF ¶¶ 46–47. Plaintiff also allegedly witnessed Mr. Roth pound his fists on Plaintiff's Hispanic colleagues' desks on at least four occasions and witnessed Mr. Roth yell at her Hispanic colleagues on at least five occasions. DSUF ¶ 47; PCSMF ¶ 47. Plaintiff once emailed Mr. Roth's supervisor, Ms. Gerancher, to complain that Mr. Roth had a practice of "verbally abusing employees on a daily basis." DSUF ¶ 43; PCSMF ¶ 43.

Plaintiff also alleges that Mr. Roth improperly marked her absent on two days between 2016 and 2017 when she had actually been taking approved medical leave. DSUF ¶¶ 30, 32–33; PCSMF ¶¶ 30, 32–33. Ms. Gerancher confirmed that one of the absences had been improperly recorded and corrected the record accordingly. DSUF ¶ 34; PCSMF ¶ 34. When Plaintiff escalated her complaint about the second absence to a human resources representative, the representative informed Plaintiff that she needed to submit further documentation to have the second absence removed from her record. DSUF ¶ 36; PCSMF ¶ 36. Plaintiff did not submit this documentation, and the second absence remained on her record. DSUF ¶ 36; PCSMF ¶ 36. Because this absence remained on Plaintiff's record, her overall annual performance score fell to 3.524 when it could have been about 3.547. JA 506. Despite being lower, however, Plaintiff's

performance score remained high enough to earn her a merit raise. DSUF ¶ 15; PCSMF ¶ 15.

Beyond Mr. Roth's allegedly discriminatory conduct, Plaintiff alleges that she experienced discrimination in the form of unequal pay. In the summer of 2017, Plaintiff learned that she was earning less than her Caucasian colleague, Ms. Naselli. DSUF ¶¶ 58–59; PCSMF ¶¶ 58–59. Ms. Naselli had just been hired but was earning $16.25 per hour. DSUF ¶ 59; PCSMF ¶ 59. Plaintiff, who had by that point been working with Defendant for more than four years, was earning only $15.41 per hour. DSUF ¶ 59; PCSMF ¶ 59.

Plaintiff brought the pay differential to Mr. Hinkle's attention and asked for a raise. DSUF ¶ 67; PCSMF ¶ 67. Mr. Hinkle was surprised by the differential, believed it was unwarranted, and began asking his colleagues how it had come to be and what could be done about it. JA 750. Mr. Hinkle's questions set off a three-month long inquiry among management into why Plaintiff's wage was lower than Ms. Naselli's. DSUF ¶¶ 77–85; PCSMF ¶¶ 77–85. During this inquiry, a human resources representative informed Plaintiff's manager that salaries are supposed to be set by the recruiter who solicits candidates for the vacant job. JA 749. But the representative believed a manager may have circumvented this policy and set Ms. Naselli's salary unilaterally. JA 749. The inquiry also revealed that two managers had been involved in hiring Ms. Naselli: a person named "Dawn" and Mr. Roth. JA 741. But Dawn had not recommended offering Ms. Naselli a higher salary. JA 741. And Mr. Roth has testified that he did not have any authority to set salaries himself. JA 450–51 (Roth Dep. at 88:24–89:4).

During discovery, Defendant produced another explanation for the pay differential. A manager in Defendant's Compensation Department has testified that Defendant maintains a schedule of pay ranges that determine how much new hires should be paid, that this schedule often provides different levels of compensation for external hires than it does for internal

transfers, and that Ms. Naselli's pay was within the pay range established at the time she was

hired for an external hire with her experience. JA 455–57 (Decl. Matthew Maidman ¶ 14–20).

While management was debating Plaintiff's request for a raise, a supervisor position

became available in Plaintiff's department, and Plaintiff applied. DSUF ¶¶ 94–96; PCSMF ¶¶

94–96. Three other internal candidates applied, all of whom were Caucasian. DSUF ¶ 96;

PCSMF ¶ 96. Ms. Gerancher conducted the interviews of these candidates, but Mr. Roth sat in

on these interviews to take notes and to give Ms. Gerancher his opinion on each candidate.

DSUF ¶ 101; PCSMF ¶ 101; JA 344 (Gerancher Dep. at 33:20–34:4).

Plaintiff did not get the job. DSUF ¶ 106; PCSMF ¶ 106. Ms. Gerancher has testified that

she chose not to promote Plaintiff because Plaintiff performed poorly during her interview.

DSUF ¶ 102; PCSMF ¶ 102. According to Ms. Gerancher, Plaintiff did not maintain a

"professional, calm demeanor" and "unraveled" during the interview. DSUF ¶ 103; PCSMF ¶

103. Mr. Roth has also testified that Plaintiff was not answering the questions Ms. Gerancher

was asking her. JA 414–15 (Roth Dep. at 48:16–49:1).

Instead of promoting Plaintiff, Ms. Gerancher promoted one of Plaintiff's Caucasian

colleagues, Ms. Stone. DSUF ¶ 106; PCSMF ¶ 106. Ms. Stone had more experience working in

healthcare and with Defendant than Plaintiff, but Plaintiff had been working for the Patient

Financial Services Department for a longer time than Plaintiff. DSUF ¶¶ 108–112; PCSMF ¶¶

108–112.

Shortly after Plaintiff was passed over for the promotion, she reminded management of

her request for a raise. Plaintiff sent an email to Mr. Hinkle restating her request for a raise and,

for the first time, explicitly stating that she believed the pay differential was racially

discriminatory. DSUF ¶¶ 88–89; PCSMF ¶¶ 88–89. Within a month, Defendant increased

Plaintiff's pay to $18.00 per hour. DSUF ¶ 92; PCSMF ¶ 92.

Even after Plaintiff received this raise, however, her relationships with management continued to deteriorate. Mr. Roth transferred out of Plaintiff's department in May of 2018 and had his last contact with Plaintiff in early June of 2018. DSUF ¶¶ 50–51; PCSMF ¶¶ 50–51. But Ms. Stone had taken Mr. Roth's place as Plaintiff's supervisor. DSUF ¶ 113; PCSMF ¶ 113. In June of 2018, Ms. Gerancher and Ms. Stone met with Plaintiff to inform her that she was transferring too many calls to Ms. Stone. DSUF ¶ 113; PCSMF ¶ 113. Following this interaction, Plaintiff experienced chest pains that allegedly caused her to spend the weekend in the emergency room. DSUF ¶ 114; PCSMF ¶ 114. Around this same time, Plaintiff missed work due to an emergency involving her child. DSUF ¶ 122; PCSMF ¶ 122. Plaintiff asked if she could make up the time on the weekend as she alleges a colleague of hers often used to do, but Ms. Stone would not let her make up the time. DSUF ¶¶ 122–124; PCSMF ¶¶ 122–124. A few months later, in October, Ms. Stone allegedly told Plaintiff she did not need to take notes during a staff meeting but then chastised Plaintiff afterwards for not taking notes. DSUF ¶ 126; PCSMF ¶ 126. None of these interactions resulted in formal discipline for Plaintiff. DSUF ¶117; PCSMF ¶ 117.

By the end of October 2018, Plaintiff had made up her mind to resign. DSUF ¶ 134; PCSMF ¶ 134. On November 13, 2018, Plaintiff sent an email to Mr. Hinckle giving Defendant two weeks' notice. DSUF ¶ 138; PCSMF ¶ 138. The email raised a variety of complaints about the way management had treated Plaintiff, including some allegations that management had discriminated against Plaintiff on the basis of her race. JA 774. Plaintiff continued to work through her notice period, and her last day of work was November 27, 2018. DSUF ¶ 140; PCSMF ¶ 140.

**b.    Procedural History**

Plaintiff filed a Complaint alleging that Defendant had violated Title VII and § 1981 by discriminating against her on the bases of her race and national origin. *See* ECF No. 1. Defendant moved to dismiss many of these claims. *See* ECF No. 11. The Court granted the motion in part, dismissing Plaintiff's Title VII claims insofar as they were based on discrete acts occurring before July 14, 2018 and dismissing her § 1981 claims insofar as they were based on discrete acts occurring before December 10, 2015. *See* ECF Nos. 18, 19. Plaintiff did not file an amended complaint.

The parties then proceeded to discovery. After the close of discovery, Defendant moved for summary judgment. *See* ECF No. 40. In Plaintiff's response, Plaintiff further withdrew her claim for retaliation under Title VII. *See* ECF No. 41, Pl.'s Mem. Law Opp. Summ. J. ("Pl.'s Br.") at 2 n.1. Plaintiff also withdrew her hostile work environment claim under Title VII, *id.*, but the Court had already dismissed that claim, ECF No. 18, Mem. Op. at 5–6.

## III.    LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). And a fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

The Third Circuit has instructed that courts should grant summary judgment "sparingly" in employment discrimination cases. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008).

## IV.   ANALYSIS

Plaintiff claims that Defendant discriminated against her by subjecting her to a hostile work environment and disparate treatment on the basis of her race and national origin and to retaliation for complaining about discrimination. Under the category of disparate treatment, Plaintiff brings three distinct claims. First, Plaintiff claims Defendant failed to pay her equally. Second, Plaintiff claims Defendant failed to promote her. Third, Plaintiff claims Defendant constructively discharged her. The Court will first address Plaintiff's hostile work environment claim, then address each of Plaintiff's disparate treatment claims, and then address her retaliation claim.

### a. Hostile Work Environment

To prevail on a hostile work environment theory of discrimination under § 1981, a plaintiff must prove (1) she suffered intentional discrimination because of her protected characteristic; (2) the discrimination was severe or pervasive; (3) she was detrimentally affected by the discrimination; (4) the detrimental effect was objectively reasonable; and (5) the existence of respondent superior liability. *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017).

Defendant argues Plaintiff has failed to produce evidence upon which a reasonable jury could conclude that the discrimination in Plaintiff's work environment was severe or pervasive. Discriminatory conduct is "severe or pervasive" if it is significant enough to alter the conditions of an employee's employment. *Castleberry*, 863 F.3d at 264. In applying this standard, courts must consider all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Id.*

Looking to the record as a whole, Plaintiff has produced evidence suggesting that she worked under a supervisor who regularly singled out Hispanic employees for verbal abuse and physically aggressive displays of authority. Plaintiff has testified to observing Mr. Roth engage in such behavior at least ten times over the course of a two-year period in a relatively small office of just thirteen employees. Plaintiff even made a complaint to management about Mr. Roth's behavior. And while Mr. Roth ultimately transferred out of Plaintiff's department, Plaintiff has also produced evidence indicating that her other managers continued to single her out for undue criticism. And, as discussed below, Plaintiff has also produced evidence suggesting that Defendant paid her less than her Caucasian colleagues and refused to promote her because of her race.

Of course, a jury may not credit Plaintiff's testimony or may not draw inferences in her favor and may, as a result, ultimately find in favor of Defendant. That is the jury's prerogative. But a reasonable jury certainly *could* rely on this evidence to conclude that Plaintiff experienced severe or pervasive discrimination in her work environment. Accordingly, the Court cannot enter summary judgment on Plaintiff's hostile work environment claim under § 1981.

### b. Disparate Treatment

Disparate treatment claims under Title VII and § 1981 follow the *McDonnell Douglas* framework. To establish a prima facie case, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she suffered a materially adverse employment action; and (4) the circumstances of the adverse employment action support an inference of discrimination. *Whitmore v. Nat'l R.R. Passenger Corp.*, 510 F. Supp. 3d 295, 304 (E.D. Pa. 2020) (citing *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410–11 (3d Cir. 1999)). Once a plaintiff has established a prima facie case, the employer must come forward with a legitimate, non-discriminatory reason for its adverse employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the employer does so, then the trier of fact must proceed to weigh the evidence and determine the ultimate issue: whether of the employer's adverse action was in fact motivated by discriminatory intent.[1] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

At trial, a plaintiff may prevail by demonstrating either that the employer *was not*

---

[1] A plaintiff must prove that discriminatory intent was a "motivating factor" for its employer's adverse actions for claims brought under Title VII. 42 U.S.C. § 2000e-2(m). For claims brought under § 1981, a plaintiff must show that discriminatory intent was a "but-for cause" of the employer's adverse actions. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

motivated by the non-discriminatory reason it now advances or that the employer *was* motivated by discriminatory intent. *Id.* Accordingly, a plaintiff may survive summary judgment by producing evidence that either casts "substantial doubt" upon the employer's non-retaliatory explanation *or* suggests that the employer was truly motivated by discriminatory intent. *Fuentes*, 32 F.3d at 765.

Plaintiff claims that Defendant took three different adverse employment actions against her: paying her unequally, failing to promote her, and constructively discharging her. The Court will address each adverse action in turn.

### i.  Pay Discrimination

Defendant does not dispute, for the purposes of its motion for summary judgment, that Plaintiff was a member of a protected class, that she was qualified for her position, and that she was subjected to an unequal rate of pay. Def.'s Br. at 16–17. Accordingly, the Court need only determine whether the circumstances surrounding Plaintiff's unequal pay support an inference of discriminatory intent, whether Defendant has come forward with a legitimate, non-discriminatory reason for the unequal pay, and whether a reasonable jury could conclude that Defendant was motivated by discriminatory intent despite the non-discriminatory justification it offers.

At the outset, however, the Court notes that Plaintiff's pay discrimination claim fails as a matter of law under Title VII. As the Court explained in its Memorandum Opinion and Order resolving Defendant's motion to dismiss, Title VII's statute of limitations prevent Plaintiff from recovering for any acts that occurred before July 14, 2018. *See* ECF No. 18, 19. It is the clear from the record before this Court that any pay inequality Plaintiff experienced was resolved when Defendant gave her a raise in April of 2018. Since any adverse payment action did not

persist up to or beyond July 14, 2018, Defendant is entitled to summary judgment in its favor on Plaintiff's pay discrimination claim under Title VII.

Accordingly, the Court turns to Plaintiff's pay discrimination claim under § 1981. Plaintiff argues she has produced evidence supporting an inference of discriminatory intent by identifying a Caucasian comparator employee who was otherwise similarly situated to Plaintiff yet was paid more. The Court must agree with Plaintiff on this point.

To be considered similarly situated, a comparator employee must be similarly situated in all relevant respects. *Edwards v. Albert Einstein Med. Ctr.*, 533 F. Supp. 3d 215, 223 (E.D. Pa. 2021) (citing *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011)). In determining whether employees are similarly situated, a court must take into account factors such as the employees' job responsibilities and the relevant supervisors and decision-makers. *Edwards*, 533 F. Supp. 3d at 223. Whether individuals are similarly situated is a factual question generally left for the jury. *Id.*

Here, a reasonable jury could conclude that Plaintiff and Ms. Naselli were similarly situated and could infer that Defendant intended to discriminate against Plaintiff in setting her wage. Both Plaintiff and Ms. Naselli had the same job with the same duties in the same department. Both worked under the same supervisors. A jury could rely on this information to conclude that Ms. Naselli is an appropriate comparator. *See McClung v. Songer Steel Servs., Inc.*, 1 F. Supp. 3d 443, 452 (W.D. Pa. 2014) ("[T]he standard is that the comparator be 'similar,' not identical."). And since Ms. Naselli is Caucasian and was paid almost one dollar more per hour than Plaintiff, a jury could infer that Defendant intended to discriminate between Ms. Naselli and Plaintiff on the bases of their race or national origin.

But Defendant has come forward with a legitimate, non-discriminatory explanation for

the difference between Plaintiff's and Ms. Naselli's pay. Specifically, Defendant has produced evidence suggesting that employee salaries are set by recruiters according to a race-neutral schedule of pay ranges that provides different levels of compensation for external hires than it does for internal transfers. Defendant argues that the difference in Plaintiff's and Ms. Naselli's pay can be explained by the fact that Plaintiff was an internal transfer while Ms. Naselli was an external hire. A jury could rely on this evidence to conclude that Defendant did not possess any discriminatory intent when it set Ms. Naselli's wage above Plaintiff's.

But Plaintiff has also produced evidence that could cast substantial doubt upon Defendant's non-discriminatory explanation. Plaintiff has produced a series of emails from her managers' inquiry into the pay differential which, when read together, suggest that Ms. Naselli's pay was *not* set by a recruiter but instead by a manager, and that the manager *could have been* Mr. Roth, who allegedly regularly expressed anti-Hispanic prejudice. A reasonable jury could rely on this evidence to conclude that Mr. Roth unilaterally increased Ms. Naselli's pay because she is Caucasian, which resulted in Plaintiff ending up with a lower wage because she is not Caucasian. Certainly, a jury could reach this result only by drawing quite a few inferences and credibility determinations in Plaintiff's favor. But the Court believes there is enough evidence in the record for Plaintiff to at least have an opportunity to present this issue to the jury.

### ii.  Failure to Promote

Plaintiff claims Defendant discriminated against her when Defendant refused to promote her to a supervisor position and promoted her Caucasian colleague instead. Defendant concedes that Plaintiff belongs to a protected class, was qualified for the supervisor position, and that she was not selected for the position. Accordingly, the Court need only determine whether the circumstances surrounding Defendant's refusal to promote Plaintiff support an inference of

discriminatory intent, whether Defendant has come forward with a legitimate, non-discriminatory reason for its refusal to promote Plaintiff, and whether a reasonable jury could conclude that Defendant was motivated by discriminatory intent despite the non-discriminatory justification it offers.

Again, Plaintiff's failure to promote claim must fail as a matter of law under Title VII because it is time-barred. It is the clear from the record before this Court that Defendant made its decision not to promote Plaintiff and to promote her colleague instead no later than April of 2018. JA 751–52 (describing Plaintiff's colleague as a supervisor on April 11, 2018). Since the adverse employment action occurred prior to the time-bar date of July 14, 2018, Defendant is entitled to summary judgment in its favor on Plaintiff's pay discrimination claim under Title VII.

Accordingly, the Court turns to Plaintiff's failure to promote claim under § 1981. Plaintiff argues she has produced evidence supporting an inference of discriminatory intent by demonstrating that Mr. Roth, a manager who allegedly regularly expressed anti-Hispanic prejudice, was involved in her interview and in the decision-making process for the supervisor position. The Court agrees that a reasonable jury could rely on this evidence to infer that Plaintiff was denied the promotion based on a discriminatory intent. *See Carroll v. Guardant Health, Inc.*, 511 F. Supp. 3d 623, 654 n.149 (E.D. Pa. 2021) ("Courts may hold an employer liable . . . where the decision-maker is free from discriminatory animus but evidence proves another employee, allegedly motivated by discriminatory animus, influenced the decision.").

But Defendant has come forward with a legitimate, non-discriminatory explanation for its decision not to promote Plaintiff. Specifically, Defendant has produced evidence suggesting that Plaintiff performed poorly during her interview. Plaintiff allegedly failed to answer the questions she was asked and became restless and agitated during her interview. And Defendant has

14

produced evidence suggesting that Ms. Stone performed well during her interview. A jury could rely on this evidence to conclude that Defendant refused to promote Plaintiff not because of any discriminatory intent but because Ms. Stone presented as better qualified for the position.

But Plaintiff's prima facie evidence that Mr. Roth was involved in the promotion decision also casts substantial doubt upon Defendant's non-discriminatory explanation. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) ("[E]vidence supporting the prima facie case is often helpful in the pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other."). A reasonable jury could rely on Plaintiff's allegations about Mr. Roth and the fact that Mr. Roth expressed his opinions about who should be hired to conclude that Defendant's promotion decision was motivated by discriminatory intent notwithstanding the non-discriminatory reason Defendant offers. Accordingly, the Court cannot grant summary judgment on Plaintiff's failure to promote claim under § 1981.

### iii.   Constructive Discharge

But the Court agrees with Defendant that Plaintiff has failed to produce evidence upon which a reasonable jury could conclude that she was constructively discharged. To prevail on a claim of constructive discharge, a plaintiff must show that her employer knowingly permitted discriminatory employment conditions "so intolerable" that a "reasonable person subject to them would have to resign." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996) (internal citation and quotation marks omitted). This inquiry is an objective one that focuses not on how the plaintiff experienced her work environment but on how a reasonable person would have. *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993), *as amended* (May 27, 1993). Discrimination must be more severe or pervasive to establish a claim for constructive

discharge than it need be to establish a claim for hostile work environment. *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006).

In evaluating claims of constructive discharge, courts often consider certain factors. These factors include:

1) whether the plaintiff was ever threatened with discharge;

2) whether the employer ever suggested the plaintiff resign;

3) whether the employer ever demoted or transferred the plaintiff to a less desirable position;

4) whether the employer altered the plaintiff's job responsibilities;

5) whether the employer reduced the plaintiff's pay or benefits;

6) whether the employer gave the plaintiff unsatisfactory job evaluations; and

7) whether the plaintiff explored alternatives to resignation, such as transferring to another department.

*Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993), *as amended* (May 27, 1993). But these factors are merely helpful considerations—they are neither necessary nor sufficient to prove a claim of constructive discharge. *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168 (3d Cir. 2001).

The first difficulty with Plaintiff's constructive discharge claim is that almost all of the conduct that supports her hostile work environment claim had been resolved months before she decided to resign. Mr. Roth transferred out of Plaintiff's department in May of 2018 and had his last contact with Plaintiff in early June of 2018. Defendant also eliminated any inequity in Plaintiff's pay by the end of April 2018. So the principal facts that support Plaintiff's hostile work environment claim do little to support her claim for constructive discharge. Indeed,

Plaintiff has not produced evidence suggesting she experienced *any* discriminatory or retaliatory treatment between July and September of 2018. DSUF ¶¶ 130–32; PCSMF ¶¶ 130–32. As a result, Plaintiff's constructive discharge claim relies almost entirely on the conflicts she had with her managers during June and October of 2018.

But Plaintiff's experiences in June and October of 2018 are not severe enough on their own to support a constructive discharge claim. In June, Ms. Gerancher criticized Plaintiff's work performance on one occasion, and on another occasion Ms. Stone refused to allow Plaintiff to work outside her normally scheduled hours. In October, Ms. Stone told Plaintiff she need not take notes during a meeting but then chastised Plaintiff for failing to take notes. Plaintiff does not allege that her supervisors said anything offensive during these interactions or that they otherwise acted in an intimidating manner. DSUF ¶¶ 118, 129; PCSMF ¶¶ 118, 129. And none of these interactions resulted in Plaintiff receiving any formal discipline. DSUF ¶ 117; PCSMF ¶ 117. Even if Ms. Gerancher's criticism was unfounded and Ms. Stone's intransigence and rebuke were unfair, these three incidents alone, spread out over the course of five months, would not make a work environment "so intolerable" that a reasonable person would feel compelled to resign.

Further, the typical factors courts usually consider in evaluating constructive discharge claims do not support a finding in Plaintiff's favor. Plaintiff was never threatened with discharge, nor did Defendant ever suggest Plaintiff resign. While Plaintiff was not promoted, she was never demoted, nor were her duties altered in any way to make her job less desirable. Defendant did not decrease Plaintiff's pay—to the contrary, Defendant *increased* Plaintiff's pay by over $2.00 per hour. And the closest things Plaintiff received to unsatisfactory job reviews were a few instances of criticism that did not result in any formal discipline or job consequences. Indeed,

Plaintiff received a performance score of 3.409 on her annual performance review in August of 2018. JA 521. This score was just 0.115 less than the score she had received the previous year and put her halfway between "consistently meets expectations" and "exceeds expectations," just as her scores had for 2016 and 2017. JA 490, 506.

Plaintiff argues that a reasonable jury could infer that her work environment was intolerable from her testimony that she had work-related panic attacks and nightmares that required medical attention. Pl.'s Br. at 6–7. But the severity of Plaintiff's subjective experience of her work environment cannot make up for her lack of admissible evidence of objectively intolerable work conditions.[2] *Clowes*, 991 F.2d at 1162 ("[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge.") (internal citations and quotation marks omitted).

Because Plaintiff has not produced enough evidence for a reasonable jury to conclude that she was constructively discharged, the Court must enter summary judgment in favor of Defendant on that claim.

### c. Retaliation

Retaliation claims under § 1981 follow the *McDonnell Douglas* framework. To establish a prima facie case, a plaintiff must show that (1) the plaintiff engaged in activity protected by the statute; (2) the employer took a materially adverse employment action against the plaintiff; and (3) there was a causal connection between the plaintiff's protected activity and the adverse

---

[2] Plaintiff also argues that her resignation letter serves as evidence of the intolerability of her work environment. The first problem with this argument is that the contents of Plaintiff's letter are hearsay, and Plaintiff provides no argument for why the Court should consider the letter's contents for the truth of the matters they assert. Fed. R. Evid. 801, 802. The second problem is that, even if the letter's contents were admissible evidence, they would not advance Plaintiff's claim. The letter does not identify any instances of mistreatment in the run-up to Plaintiff's resignation beyond the ones the Court has already discussed. *See* JA 774–776.

employment action. *Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017) (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 340–42 (3d Cir. 2006)). Once a plaintiff has established a prima facie case, the defendant must come forward with a legitimate, non-retaliatory reason for its adverse employment action. *Moore*, 461 F.3d at 342. If the employer does so, then the trier of fact must proceed to weigh the evidence and determine whether retaliatory intent was the but-for cause of the employer's adverse action. *Id.*

The parties seem to agree that Plaintiff engaged in two protected activities: reporting harassment by a coworker before she transferred to the Patient Financial Services Department and submitting her letter complaining of pay discrimination on April 4, 2018. Def.'s Br. at 20; Pl.'s Br. at 18; *see also* DSUF ¶ 89; PCSMF ¶ 89. But the parties disagree about which of Defendant's actions were materially adverse.

An employment action is materially adverse when it could dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Typical materially adverse actions include decisions to hire, fire, reassign or not to promote an employee. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). An employer's creation or maintenance of a hostile work environment can also constitute a materially adverse employment action. *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014). But unfair reprimands and negative performance reviews generally are not materially adverse actions unless they are accompanied by "tangible job consequences." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 383 (7th Cir. 2020); *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008); *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001).

As discussed above, Plaintiff was not constructively discharged, so her resignation cannot be treated as a materially adverse employment action. Plaintiff also argues that Defendant took a materially adverse action against her by incorrectly recording absences on her performance evaluation. These absences did reduce Plaintiff's overall performance score by 0.023 of a point. But Plaintiff remained eligible for a merit raise despite her lower score, and Plaintiff has produced no evidence nor argued that her slightly lower performance score affected the size of her merit raise. Since Plaintiff has not shown that the recording of these absences had any tangible job consequences, the recording of these absences, even if erroneous, cannot be considered adverse actions.

Plaintiff argues that her interactions with Ms. Gerancher and Ms. Stone in June constitute materially adverse actions because they caused Plaintiff to experience severe emotional and physical distress. Pl.'s Br. 18–19. But plaintiff's subjective experience of an employer's action does not determine whether that action was materially adverse. *See Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 787 (3d Cir. 1998) ("If an individual's hypersensitivity causes him or her to suffer tangible psychological harm that a reasonable person would not suffer under similar circumstances, then that individual cannot seek protection from the . . . anti-retaliation provision."). Viewed objectively, these interactions, at worst, represent instances in which a manager was unfairly critical of and unaccommodating to an employee. While it is unfortunate that these incidents had such a negative impact on Plaintiff's health, they still represent nothing more than the slights and annoyances that are commonplace in all workplaces. As a matter of law, such slights and annoyances are not materially adverse employment actions. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Accordingly, the only actions Defendant took against Plaintiff that could be considered materially adverse were maintaining a hostile work environment—if indeed a jury finds one existed—and failing to promote Plaintiff.

Next, the Court must determine whether a jury could infer a causal connection between Plaintiff's protected activity and these adverse actions. To determine whether a causal connection could be inferred, the Court must consider all the circumstances. *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017). The fact that an adverse action followed shortly after protected activity can support an inference of causation. *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000). But as the time between the protected activity and the adverse action grows longer, it offers less support to the inference. *See Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding three weeks insufficient to support an inference of causation); *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (finding two months and a week insufficient to support an inference of causation); *see also Rosati v. Colello*, 94 F. Supp. 3d 704, 717 (E.D. Pa. 2015) ("Days are suggestive; months are not.").

Plaintiff has not produced evidence from which a reasonable jury could infer a causal connection between any of Plaintiff's protected activity and any of Defendant's adverse employment actions. Insofar as Plaintiff engaged in protected activity by reporting harassment in her previous department, Plaintiff made those reports no later than November of 2015, which is when Plaintiff transferred to Patient Financial Services. Plaintiff then began working under Mr. Roth, who allegedly subjected Plaintiff to a hostile work environment. While there could be close temporal proximity between Plaintiff's reporting and Mr. Roth's hostile work environment, no jury could rely on this temporal proximity to infer causality because Plaintiff has not

produced any evidence that Mr. Roth knew about Plaintiff's past reporting activity until years after she began working in his department. Further, Plaintiff alleges that Mr. Roth was hostile toward *all* Hispanic employees, not just toward her, which further detracts from any inference that Mr. Roth was retaliating against Plaintiff for her decision to report harassment in her previous post. Indeed, the vast majority of Plaintiff's allegations regarding Mr. Roth's hostile behavior describe her observations of how he treated her colleagues.

Further, no jury could infer a causal relationship between Plaintiff's reporting of racial harassment in 2015 and Defendant's failure to promote her in 2018. Of course, the more than two-year gap between these two incidents is far too long to support an inference of causality. And Plaintiff has failed to produce any other competent evidence that Ms. Gerancher was influenced by Plaintiff's history of reporting racial harassment when she decided not to promote Plaintiff. Plaintiff argues that *she believes* Ms. Gerancher was influenced by Plaintiff's history of reporting racial harassment. *See* PCSMF ¶¶ 148, 149. But Plaintiff's speculation is not competent evidence. *Martin v. Healthcare Bus. Res.*, No. 00-3244, 2002 WL 467749, at *6 (E.D. Pa. Mar. 26, 2002) ("Plaintiff's mere pronouncement or subjective belief that she was terminated because of her race . . . is not a substitute for competent evidence.").

There is potentially competent evidence that Ms. Gerancher said she decided not to promote Plaintiff because of Plaintiff's "past" in Plaintiff's previous department. JA 173, 174 (Pl.'s Dep. at 110:20–111:12). But the record does not provide any further clarity as to what about Plaintiff's past Ms. Gerancher may have considered or whether Ms. Gerancher even knew about Plaintiff's history of reporting harassment. JA 174–76 (Pl.'s Dep. at 111:13–113:24). No reasonable jury could rely on this vague reference to the "past" to infer that Ms. Gerancher knew

Plaintiff had reported a co-worker for harassment in her previous department, much less that Ms. Gerancher intended to retaliate against her for doing so.

Finally, no reasonable jury could infer a causal relationship between Plaintiff's complaint about pay discrimination and any of Defendant's materially adverse actions because Plaintiff made her complaint *after* the adverse actions had occurred. Ms. Gerancher had already filled the vacant supervisor position by the time Plaintiff first complained that her wage was racially discriminatory in April of 2018. And, as discussed above, if Plaintiff's work environment ever was hostile, it certainly was no longer hostile by the time she complained that her pay was racially discriminatory. Indeed, the hostility of Plaintiff's work environment revolved almost entirely around the behavior of Mr. Roth, and Mr. Roth transferred out of Plaintiff's department just a few weeks after Plaintiff made her complaint.

Because Plaintiff has produced no evidence from which a reasonable jury could infer a causal relationship between Plaintiff's protected activities and Defendant's materially adverse employment actions, Plaintiff's retaliation claim must fail as a matter of law. Accordingly, Defendant is entitled to summary judgment in its favor on that claim.

## V.      CONCLUSION

Defendant is entitled to summary judgment in its favor on all of Plaintiff's claims brought under Title VII because each of those claims either has been withdrawn or is time-barred.

Defendant is entitled to summary judgment in its favor on only some of Plaintiff's claims under § 1981. Plaintiff's work environment was insufficiently intolerable to support a claim for constructive discharge, so Defendant is entitled to summary judgment in its favor on that claim. And no reasonable jury could infer a causal relationship between Plaintiff's protected activities and Defendant's materially adverse employment actions, so Defendant is entitled to summary judgment in its favor on Plaintiff's retaliation claim. But there remain genuine disputes of fact in each of Plaintiff's other claims, so the Court cannot enter summary judgment on those claims.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge